Professor Michael LEVIN, Plaintiff,

v.

Bernard W. HARLESTON, President of the City College of the City University of New York, individually and in his official capacity; and Paul Sherwin, Dean of the City College of the City University of New York, individually and in his official capacity, Defendants.

No. 90 CIV 6123 (KC).

United States District Court, S.D. New York.

Sept. 4, 1991.

Scott M. Univer, New York City, for plaintiff.

Clement J. Colucci, NYS Dept. of Law, New York City, for defendants.

## OPINION AND ORDER

CONBOY, District Judge:

This case raises serious constitutional questions that go to the heart of the current national debate on what has come to be denominated as "political correctness" [1]

---

**1.** The term is now formally defined as follows: "Marked by a progressive orthodoxy on issues involving race, gender, sexual affinity or ecology." *Random House Webster's College Dictionary,* 1991. *See also,* "Political Correctness: New Bias Test?", by Robert D. McFadden; *New*

in speech and thought on the campuses of the nation's colleges and universities.

A professor who has had tenure for over sixteen years at one of America's most famous institutions of higher learning, singularly noted for its bracing environment of broad and untrammeled speech,[2] claims that his tenure is in jeopardy, his students drawn away, his classes disrupted, his reputation injured, and his speech chilled as a result of the actions of his college's administrators, who are said to be repelled by his views on affirmative action quotas and the relative intelligence of blacks and whites, and who are said to be, by their actions, seeking to suppress those views.

The college officials say that his views are odious, and rightly denounced, and that although he has committed no act of academic misconduct or discrimination against his students, and although there is no complaint by any of his students against him, they are permitted to structure the class schedule to provide alternative professors to "insulate" and "protect" his present and future students from his views.

Professor Michael Levin has brought this action pursuant to federal civil rights law, 42 U.S.C. § 1983, and the First and Fourteenth Amendments to the United States Constitution.

We conclude that Professor Levin has convincingly established his case, that the defendant college officials have sought to and did punish him in retaliation for and solely because of his expressed ideas, that in so doing they have violated his constitutional rights and the civil rights laws of the United States, and that federal injunctive relief is necessary to secure Professor Levin's rights on the campus of City College of the City University of New York. We will now elaborate upon these findings.

The constitutional questions presented by this case are a) whether the creation of what in this lawsuit have been denominated "shadow sections" by City College officials, to which Professor Levin's students, having been warned by the College Dean that his views are "controversial", may voluntarily switch, have operated or may operate to abridge Professor Levin's free speech rights under the First Amendment of the Constitution, and abridged his tenure rights under the Fourteenth Amendment of the Constitution, and b) whether the creation by the College President of an "ad hoc Committee" of faculty to investigate Professor Levin's writings but not apparently, any of his conduct, is a constitutionally impermissible attempt by the College to silence his views through an implicit threat to revoke his tenure, and constitutes a discrete injury to his tenure, in violation of the First and Fourteenth Amendments of the Constitution. These are largely legal questions, as the parties at trial did not dispute any material facts underlying them.

Finally, there is presented the factual question as to whether college officials have tacitly approved the disruption of Professor Levin's classes by failing to identify and discipline persons who have on numerous occasions disrupted and caused to be

---

York Times, May 5, 1991, Section 1, Part 1, Page 32.

2. City College, established in 1847 as a public institution and known as the Free Academy, was the subject in 1940 of a ferocious public reaction to the appointment of the eminent British mathematician, logician, and philosopher Bertrand Russell to the College's Philosophy Department. He was denounced by the Episcopal Bishop of New York as "a recognized propagandist against both religion and morality, who specifically defends adultery." In a paroxysm of the most astonishing vilification of Russell from newspapers, pulpits, and politicians, the appointment was cancelled by a state judge in a shameful manipulation of procedural rules, over the objection of three hundred members of the City College faculty. *Essays of Bertrand Russell*, edited, with an Appendix ("How Bertrand Russell Was Prevented From Teaching at the College of the City of New York") by Paul Edwards, 1967. To a previous generation of philosophy students at City College shortly after the First World War, the celebrated Chairman of the Philosophy Department, Professor Harry Overstreet, was a particular source of pride because he gave eloquent speeches against the Palmer Raids in a period when Red—baiting made it especially hazardous to do so. *See, Out of Step, An Unquiet Life in the Twentieth Century* by Sidney Hook, 1987. *See generally, The College of the City of New York* by S. William Rudy, 1949.

terminated philosophy classes being conducted by Professor Levin. The resolution of this question has a bearing on whether the disruptions, which are conceded, constitute a separate abridgement by the College of Professor Levin's free speech rights, and an injury to his liberty and property interests in his tenure.

Michael Levin, the plaintiff, holds a doctorate in philosophy and is a tenured member of the faculty of the City College of the City University of New York ("City College"), a public institution funded in part by the State of New York. The remaining defendants are Bernard W. Harleston, President of City College, and Paul Sherwin, Dean of City College. Various members of the faculty of City College who were asked to and did serve on the Ad Hoc Committee convened by President Harleston to inquire into certain writings of Professor Levin, and certain views he expressed outside of his classroom, which views have been characterized on the campus as racist, were initially named as defendants and then later dismissed.

Professor Levin claims that his right to freedom of expression secured by the First Amendment to the Constitution of the United States, and his property rights in the full enjoyment of his tenured status secured by the Fourteenth Amendment, have been violated by defendants' actions and failures to act, and will, in the absence of injunctive and declaratory relief from this Court, continue to be violated. Specifically, Professor Levin claims that the appointment of the Ad Hoc Committee to determine whether his published writings and public statements outside of his classes go beyond the bounds of academic freedom and constitute conduct unbecoming a member of the City College staff has i) chilled and continues to chill his right of freedom of expression; ii) threatened and continues to threaten his academic freedom, employment, tenure status and freedom to enjoy such status without peril of disciplinary

action; and iii) injured and continues to injure his reputation, professional standing, professional and academic opportunities, and prospects of alternative employment in his field. Professor Levin also claims that the establishment by Dean Sherwin, with the knowledge and approval of President Harleston, of alternative classes ("shadow sections") to his introductory philosophy course, with an accompanying letter warning his students that Professor Levin had expressed controversial views, had the intended effect of injuring his free speech and tenure rights.

Finally, Professor Levin claims that the failure of the President and Dean to prevent or take effective steps to investigate repeated disruption of his classes by demonstrators has contributed to the aforementioned injuries to his tenure and rights under the Constitution.

The defendant City College's President and Dean deny violating or threatening to violate Professor Levin's constitutional rights and argue that, in any event, they are protected from personal liability in this action by the doctrine of "qualified immunity," predicated on their good faith belief in the legitimacy of their actions.

In a prior opinion, reported at 752 F.Supp. 620 (S.D.N.Y.1991), we denied defendants' motion to dismiss, finding that Professor Levin's claim was justiciable in federal court. The case was tried without a jury on May 7, 8, and 9, 1991, and post-trial papers were filed on May 30, 1991. This opinion shall constitute the Court's findings of fact and conclusions of law in the matter.

## FACTUAL BACKGROUND

### Professor Levin's Writings

The writings of Professor Levin that have made him a subject of controversy are three in number.[3] They are a letter to the editor of the *New York Times*, published

---

**3.** There is reference in the record to other writings and statements of Professor Levin, embodied in a letter to the campus newspaper, and appearances on the television programs *Newsmakers* and the *Morton Downey Show* (!). As

neither side introduced with any precision the substance of these expressions, we will not consider them further. *See,* Trial Transcript (hereinafter Tr. __) 277–81.

January 11, 1987; a book review that appeared in the January/February, 1988 issue of an Australian journal called *Quadrant;* and a January, 1990 letter published in the Proceedings of the American Philosophical Association.

The Sunday edition of the *New York Times* for January 11, 1987 carried a letter to the editor signed by Professor Levin, in which he responded to, and criticized, a *Times* editorial published on the previous December 28th. He asserted that the editorial had misunderstood the ethical formulations of the eminent Harvard philosopher John Rawls, and that the citation to Rawls was "obviously an effort to bolster a position reached on nonphilosophical grounds." PX 1.[4] The full text of the editorial is as follows:

### Fear of Blacks, Fear of Crime

It's very easy to spot a black person in this neighborhood, and whenever I see one, I know he's up to no good. They come in the neighborhood and rob everybody. It's a known fact. That's why everybody has a thing about them.

That's how a construction worker named Jimmy, from Howard Beach, Queens, tried to explain why a gang of teen-agers armed with bats and clubs last week chased and beat three blacks whose only apparent offense was to walk through his neighborhood.

The same crude presumption—that blackness indicates criminality—haunts the trial of Bernhard Goetz, who claims self-defense for shooting down four young blacks on a subway train. The presumption recently led a Louisiana sheriff to order deputies to stop and question all blacks on sight, and it produced furious debate in Washington, D.C. over whether local stores, fearing robbery, should refuse to admit black men. Signs on the doors of small shops on the upper East Side of Manhattan— "Men by appointment only"—also mask the ugly question: Shouldn't one assume that black men are up to no good?

Many whites would answer yes, observing that blacks, especially young black men, commit more than their share of crime. National surveys estimate that blacks commit robbery at a rate 10 times that of whites. Yet blacks cannot be faulted for denouncing the automatic assumption that the potential victim's viewpoint is the only one. What about the vast, innocent majority of blacks? Why shouldn't they be able to shop where they want, hail cabs and walk city streets, even in Howard Beach? Why must millions pay for the sins of a few?

The issue engages a classic dilemma of utilitarianism versus individual rights: At what point, if ever, should needs of the community as a whole be allowed to harm an innocent minority? John Rawls, the philosopher, suggests one widely respected answer: No one ought to endorse a social order that he could not accept if he were in the shoes of the most disadvantaged.

Who, then, is more disadvantaged, the innocent white subjected to crime and fear of crime, or the innocent black forced into humiliating inconvenience and heightened risk of violence from mistaken acts of self defense?

The innocent potential victim of crime has more options for protection against burglary and robbery—guards, locks, dogs, alarms and buzzers, legitimate community organizing. Innocent victims of discrimination based on popular fear can do little but submit. There is no reason to choose: Discrimination, cumulatively, can be as poisonous as mugging or burglary. Both kinds of pain diminish the civility of modern life.

There is no remedy, only an approach, the one suggested by John Rawls. It's not hard for blacks to put themselves in the shoes of fearful shopkeepers and citizens; they are, too often, fearful citizens themselves. Fearful whites need to put themselves in the shoes of innocent blacks. Doing so will not dissipate the reasons for fear, but it can steadily inspire the understanding and reason that

---

**4.** "PX＿＿＿" references plaintiff's exhibits received in evidence at the trial.

keep fear in its place.[5]

The full text of Professor Levin's letter in response, under a headline selected by *The Times*, is as follows:

### Howard Beach Turns a Beam on Racial Tensions

The reference to John Rawls in "Fear of Blacks, Fear of Crime" (editorial, Dec. 28) would illustrate the risks of misunderstanding philosophy, were it not so obviously an effort to bolster a position reached on nonphilosophical grounds.

You say that the Rawls principle that "No one ought to endorse a social order that he could not accept if he were in the shoes of the most disadvantaged" implies that people ought not to take even rational steps to avoid being victimized by black criminals.

In the first place, as the wording suggests, Rawls proposes this principle as a test of the basic institutions of a society, if they were being chosen from a position of total ignorance about one's actual place in that society. It does not constrain particular decisions made within a given society as a going concern, when specific information is available about the actual risks one faces.

It is important to bear in mind that the Rawls principle is in any case not fundamental and rests on the precept that, whatever the probability that the worst will actually occur, the worst possible outcome should be made as tolerable as possible.

If social policy is going to be made from this pessimistic perspective, then even the occupants of society's worst off position will endorse rules permitting steps to avoid assault on one's person. However badly off you are, you are worse off mugged (as homeless people who fear city shelters demonstrate).

If information about appearance can be used to reduce the probability of being attacked, one may use it. Even other blacks are presumably more wary of 17 year old black males wearing running shoes and hooded sweatshirts than they are of other members of the population.

You indirectly try to make these points by proposing the quite incredible idea that it is just as bad to be discriminated against as it is to be robbed or murdered—or, at any rate, that a society in which prejudice is rampant is as bad as one in which violent crime is rampant.

Individual tastes in disaster may differ, but surely the innocent black turned away from a Madison Avenue boutique would not wish to change places with a boutique owner who has just been assaulted. It is unfortunate that innocent blacks must be inconvenienced because of the behavior of guilty blacks, but if we are to play the put-yourself-in-his-shoes game, the innocent black who puts himself in the shoes of the vulnerable boutique owner should just as surely conclude that he would not let himself in under similar circumstances.

It is hard to fathom your sudden concern with the penalized innocent given your steadfast endorsement of affirmative action quotas that invariably penalize whites innocent of discriminating. Is discrimination against innocent whites a tolerable price for insuring jobs for blacks while discriminatory inconvenience for innocent blacks is too high a price for reducing the risk of murder for white store owners?

PX 1.

One year later, in the January/February, 1988 issue of *Quadrant*, an Australian journal published in Sidney, there appeared a book review by Professor Levin of two then current and controversial best-sellers in the United States dealing with education, *Cultural Literacy*, by E.D. Hirsch and *The Closing of the American Mind*, by Allan Bloom. The article, entitled "The Trouble With American Education", is in the record as PX 4.

This article, approximately 3500 words in length, is in large measure given over to arguments about cultural transmission of common and historical experience, sweeping claims about intellectual history, and the place of value judgments in a college

---

**5.** New York Times, December 28, 1986, Section 4 P. 10, Col. 1.

education. The text of that portion of Professor Levin's article that is germane to the case at hand is as follows:

[A] cause of the malaise of American education is race, a topic approached but not quite reached by Hirsch and Bloom. Since 1954, staggering energies have been expended to bring American Negroes into the educational mainstream. Yet they continue to exhibit disproportionately high rates of illiteracy, dropping out, absence from the more prestigious disciplines, and other forms of academic failure. The conventional explanation of this failure is bias in the standards by which students are judged; adjust the standards to eliminate race bias, and all will be well. And adjustments have been made to eliminate any measure on which blacks underperform, it always being assumed that blacks are on average as intelligent as whites and as capable of passing any fair test in proportionate numbers. But there is now quite solid evidence that this assumption is not correct; the average black is significantly less intelligent than the average white. Therefore, the only adjustments in educational measures that will allow blacks their due number of successes amount to making course-work and tests easier and easier, and this is what has been going on for over thirty years. Conversely, if standards are going to be raised, cultural literacy reasserted and college education given its old depth and focus, the American polity will have to reconcile itself to an embarrassing failure rate for blacks.

The uncomfortable fact is that knowledge of factual matters is highly correlated with IQ for reasons that Hirsch's analysis makes plain. Intelligent people are able to incorporate what they hear into larger intellectual structures, and thereby retain it more effectively. Some years ago (I do not know if this is still true) IQ tests asked the testee if he knew what the Apocrypha is. This may seem culturally biased, but the average person in American or Australian society will almost certainly have heard at least one reference to the Apocrypha in his life-

time, or at least have heard the adjective "apocryphal". The intelligent will remember the explanation of the Apocrypha, or pursue the etymology of "apocryphal", or in some other way hook this isolated item into their overall web of beliefs. The unintelligent will not. Teach content-full texts and readers to blacks, and the result, I fear will disappoint Hirsch.

In January, 1990 Professor Levin published the following letter in the American Philosophical Association Proceedings:

The June issue of the Proceedings (Volume 62, Number 5) gives survey data concerning the numbers of blacks and other minorities in philosophy. Unsurprisingly, the proportion of blacks in the discipline is considerably below their proportion of the population.

Unfortunately, such findings in the current climate of opinion generally lead to calls for "affirmative action," i.e. preference for blacks, accompanied by mea culpas on the part of whites participating in the activity from which blacks have been found to be excluded. It should therefore be good news that whites are not responsible for this under-representation.

It has been amply confirmed over the last several decades that, on average, blacks are significantly less intelligent than whites. The black mean IQ is slightly more than one standard deviation below the white mean. In more familiar terms, that amounts to a difference of more than 15 points of IQ as measured by such standard tests as the Wechsler Adult Intelligence Scale. Philosophers seem to have fixated at a primitive verificationism about such tests, and regard such tests as measuring nothing beyond themselves. In fact, performance on IQ tests correlates quite well with performance on a large number of independently measurable variables. In a recent survey of the psychometric literature, the National Academy of Science concluded that "in the technically precise meaning of the term, [mental] ability tests have not been proved to be

biased against blacks; that is, they predict criterion performance as well for blacks as for whites."

The significance of these findings for our profession (as for the rest of society) is that black representation in a field can be expected, absent any discrimination, to decrease as the intellectual demands of the field increase. Doctors as engineers are recruited from an IQ range of 114 of above; I do not know the corresponding figure for philosophy, but it is surely just as high, and for some specialties (e.g. logic) considerably higher. Only 3% of the black population (as opposed to 16% of the white population) has an IQ in this range. Making the most optimistic assumptions, given that blacks constitute 12% of the population, only 2% (not 12%) of the profession will be black. That is close enough to current figures for all philosophers to regard themselves free of any discriminatory guilt.

*The Classroom Disruptions*

As indicated, the relevant facts in this case are in large measure not disputed by the parties.[6] Since the fall of 1984, City College policy has officially and in written regulations prohibited students from engaging in demonstrations that disrupt or obstruct teaching and research activities. Any activity disruptive of classes subjects the group and individual participants to disciplinary proceedings in accordance with Section 15.3 of the University Board of Trustees By–Laws.

On March 23, 1987, shortly after the appearance of his letter in *The Times*, Professor Levin wrote a letter, PX 48, to the City College Dean of Student Affairs, George D. McDonald, complaining of persons distributing pamphlets outside of one of his classes. A week later, on April 1, 1987, Professor Levin reported to Campus Security Chief Albert Dandridge that documents affixed to his door had been burned. Dandridge filed an "Incident Report", PX 63, and submitted a copy to Dean McDonald, among others, which stated that

Professor Levin "had been the target of demonstrations by the Day Student Government." A week after that, on April 8, 1987, a group of between 10 and 15 persons conducted a loud demonstration outside of one of Professor Levin's classes, disrupting that and other classes and blocking entry into and exit from the classroom.

Dandridge was summoned to the scene by Professor Levin. Dandridge observed one of the demonstrators, whom he later identified as Stephen N. Pearl, a student in the College, push against Security personnel in an apparent effort to inflame the situation and to exhort the other demonstrators to assault the Security officers. Dandridge obtained Pearl's student I.D. card, as well as that of another student demonstrator, Vardon Marshall, and submitted copies of the cards with a report on the demonstration, PX 52, to Dean McDonald. Dandridge also filed an Incident Report, PX 65. The following day, on April 9, 1987, Professor Levin wrote a letter, PX 2, to President Harleston, with copies to Deans McDonald and Sherwin, concerning the same incident and contemporaneous acts of harassment against himself, including an anti-Semitic threat. No one replied to this letter. Dandridge submitted an April 8, 1987 Incident Report, PX 53, to Dean McDonald concerning the threat, which was affixed to the door of Professor Levin's office and stated: "We know where you live you Jewish bastard your time is going to come."

At about this time, Dean McDonald received a typewritten letter, PX 60, purportedly written by Pearl, which denounced Professor Levin and Dean McDonald among others in terms which can only be described as utterly vile, and which threatened Dean McDonald with death. Dean McDonald turned the matter over to the police. Though unsigned, the letter bore at the bottom the typed name Stephen Pearl, President of City College I.N.C.A.R. [International Committee Against Racism] Club. The identity of the author of the letter was never established.

---

**6.** See the factual settlement agreed to by the parties in the Pretrial Order (hereinafter,

"PTO"), approved by the Court on February 11, 1991 pages 3–22.

Shortly thereafter, on April 13, 1987, Dean McDonald sent a letter, PX 54, to Pearl officially summoning Pearl to his office on April 21 to explain why he should not be subject to disciplinary measures for violating College regulations during the April 8 demonstration. A similar letter was sent to Marshall. Pearl and Marshall did not appear before Dean McDonald as required. Dean McDonald received a letter, PX 69, dated April 20, 1987, signed by "Members of INCAR and the City College Community." This letter made countercharges against College officials and stated: "we will not even consider the charges being raised against Mr. Pearl and Mr. Marshall until the charges against Mr. Dandridge, yourself and the administration are resolved to our satisfaction."

At about this time, President Harleston and Dean McDonald met with Professor Levin. They told him that academic freedom protects student demonstrators, but that the time, place, and manner of demonstrations could be regulated by the College. No commitment was forthcoming from these officials that Professor Levin's classes would proceed unimpeded in the future.

Several months later, on September 2, 1987, Dr. Levin wrote a letter, PX 3, to Dean McDonald and President Harleston complaining that Pearl was distributing leaflets outside of his class in a manner that was in apparent violation of College regulations. Neither Dean McDonald nor President Harleston replied to this letter. No further action was taken by anyone with regard to this incident.

At the trial Professor Levin testified in graphic detail about the disruption of his philosophy class because of his controversial views. Tr. 38 [7]. In April, 1987 between 20 and 50 students were outside the door of his classroom with banners, shouting and impeding Professor Levin's students from entering, and "trying to make noise so that the class couldn't continue". Tr. 38. The banners and the shouts denounced Professor Levin as a rac-

ist. Tr. 41. A melee with security went on for sometime in the corridor while Professor Levin attempted to resume his class. Tr. 41. Professor Levin met with Professor Harleston to complain about the demonstrators, but the President said that his hands were tied. According to Professor Levin's testimony, which the Court accepts as credible, the President said, " 'What do you want me to do? There's academic freedom issues here. The students have academic freedom as well, and their academic freedom is protected.' " Tr. 42.

There was a further disruption of Professor Levin's class in March, 1989. According to the Professor,

The students burst in the door, about 20 students, led by Stephen Pearl with a bullhorn. [They] began haranguing my class. I tried to talk to them. But that was not possible. They simply kept chanting and shouting, chanting and shouting. My students tried to argue with them. Most of the students were simply dumbfounded at this, in a state of shock.

Finally, after about three or four minutes, I said to the class, well, it appears we just can't continue. Remember that this is your education and dismissed the class and went back to my office.

\* \* \* \* \* \*

THE COURT: What specifically did [the demonstrators] say?

THE WITNESS: Levin is a racist. Levin must not teach here. Levin is a racist. Levin must not teach here.

THE COURT: You indicated that some of your students responded? What did they say?

THE WITNESS: What are you doing here? You can't do this.

THE COURT: In substance, would you describe whether or not there were rising tempers? Was this an emotional discussion or was it an abstract discussion befitting a philosophy class? Give us a sense, if you would, of exactly what the environment was in which you found yourself?

---

7. "Tr __" references pages in the Trial Transcript.

THE WITNESS: The word I would use is extremely intimidating. The students—I should say the invaders. My students' tempers did not rise only as I say because they seemed to be in a state of shock, intimidation out of the blue 20 people marching in and very loud, very angry shouting addressed to me, set faces, angry loud faces. Once or twice I would attempt to engage them. What is your complaint? And instead of responding, just to reiterate their chants louder, more aggressively stationing themselves in a wall in front of me, between me and the door.

THE COURT: So, in other words, your ability to get out was blocked by these people?

THE WITNESS: Yes. When I finally decided to dismiss the class they did part. But certainly it was a very intimidating atmosphere. It was clearly designed to inhibit me from teaching, frighten me. Menace me.

Q. You mentioned that you wrote a letter to vice-president McDonald about this incident?

A. Yes.

Q. Did you receive any reply to that letter?

A. No.

Q. Was there any other reaction so far as you are aware on the part of the administration to this occurrence?

A. No.

Tr. 48–51.

Professor Levin further testified that:

In March, 1990 a further incident occurred. I was teaching and in fact I had locked the door and there was a pounding at the door. So I opened it up—perhaps unwisely opened it up to see what the pounding was and about 35 or so students came in, surrounded the class, started shouting and chanting and making teaching impossible.

I had had some inkling that something like this might have occurred [sic]. I believe it was because I had seen some posters announcing a demonstration at that hour. So I thought something might be up and I mentioned it to Mr. Dandridge, the head of security, and there was some security present. Mr. Dandridge was present. He entered the class very soon after the students did and observing it decided that the wisest course would simply be to break up the class. Prior to that, my students themselves, some of my students, argued with the demonstrators and asked them to get out. But that had no effect. That was the incident.

Tr. 33.

After this incident, the College assigned a security guard, as it had done earlier, to protect Professor Levin from physical harm. Tr. 76.

At the trial, President Harleston denied that he had told Professor Levin that academic freedom protected the student demonstrators. Tr. 38. He asserted, however, that he could not recall whether he had done anything "to follow-up the college's investigation of the April, 1987 disruption of Professor Levin's class", and that he could recall nothing about the March, 1990 disruption of Professor Levin's class. Tr. 138–39. When counsel directed his attention to a resolution of the faculty senate calling upon him "to prevent disruption of classes and to discipline those who attempt such disruption", PX 27, President Harleston was unable to say whether the College Administration had carried out its responsibilities to comply with this resolution. Tr. 140. Indeed, when the Court pointed out that the question of the adequacy of the Administration's response to the disruptions of Professor Levin's classes had been put to him in a previous hearing in the case held five months earlier, and asked "[i]n the period of time that has elapsed since then, have you had occasion to review [the record] and satisfy yourself as to whether or not there was an adequate response to these complaints of disruptions in the professor's classroom", President Harleston stated that he had not. Tr. 141.

President Harleston further testified that at the aforementioned meeting in his office, which meeting had been convened at Professor Levin's request to stop the disruptions of his class, President Harleston

had said: "But, Prof. Levin, you wrote about affirmative action and it's not surprising that the students would want to ask you about it." Tr. 165. Amazingly, President Harleston also testified that he could not remember ever getting a detailed account of the disruptions complained of by Professor Levin. Tr. 166.

Finally, at the conclusion of his testimony, the following colloquy ensued between the Court and President Harleston:

THE COURT: Would you look at Exhibit W in the smaller of the two exhibit books.

Exhibit W is the statement of the university on the freedom of expression and dissent at City College.

THE WITNESS: Yes.

THE COURT: You'll note in the second to the last paragraph, on the question of the college's frowning on the disruption of classroom teaching, that the following statement is made: "The college cannot and will not tolerate behavior that interferes with or compromises responsible classroom teaching."

Now, what does the college mean when it tells its students that disruption of classes will not be tolerated in connection with responsible classroom teaching? What function does the word "responsible" serve and how does it operate in the implementation of this policy?

THE WITNESS: Your Honor, I honestly don't know, I have signed the document. It's my document. I do not know what the context for the term responsible was.

THE COURT: Do you think this might communicate a message to students who are disposed to disrupt classes that if, in their view, the teacher in the classroom is espousing irresponsible classroom teaching that such disruption would be sanctioned by the university?

THE WITNESS: I cannot imagine that it would, given all the other policies that the college has and responsible here is not used in contrast to irresponsible. I would not know what that means. But I simply cannot give you the specific meaning for responsible, sir.

Tr. 175–76.

Dean Paul Sherwin testified at the trial that although students Pearl and Marshall were cited for violations of College regulations in the disruption of Professor Levin's classes, and although they refused to appear to answer the charges, the disciplinary matter was not pursued, because to enforce the rules would have invited "chaos on the campus," and "it was moving closer to the end of the semester." Tr. 262.

Dean George McDonald, Vice President for Student Affairs, testified that he is the College's principal official responsible for student disciplinary matters, although final authority rests with President Harleston. Tr. 225. He agreed that through 1989 College policy unequivocally prohibited the use of bullhorns or amplification devices by demonstrating students during class hours. Tr. 228. Since 1989, the College's disciplinary rules have specifically prohibited the violation of the rights of professors to teach and of students to learn free from external pressures or interference. These rights, the policy asserts, will be "guarded vigilantly". PX 56. Rule 1 states that

A member of the academic community shall not intentionally obstruct and/or forcibly prevent others from the exercise of their rights. Nor shall he/she interfere with the institution's instructional services.

*Id.* Any student violating this Rule "shall" be subject to sanctions. *Id.* However, Dean McDonald conceded that the College does not, as a policy, attempt to have security personnel forcibly terminate classroom disruptions by ejecting demonstrators, or summon local police to achieve this goal. The policy is to terminate the class, and proceed against disruptive student demonstrators later. Tr. 268–72. As noted, however, according to College officials, this was not done with respect to Pearl and Marshall, because of the College's judgment that to have done so would have brought about chaos on the campus. It appears, therefore, that in circumstances such as those in which Professor Levin's teaching rights were concededly injured by Pearl and Marshall, the College has no mechanism, as a practical matter, to either

protect or vindicate the rights announced in its Rules and Regulations.

Albert Dandridge, the Director of Security at the College, made the remarkable statement at trial that there have been student "disruptions" at the College every year of his service there, which has lasted twenty-two years. Tr. 304. "In many instances we have had professors who express views that are somewhat alien to some of the students. [The students] form pressure groups and attempt to get their way." *Id.* He stated that since 1969, the police have had to be called onto the campus to restore order seven or eight times. Tr. 308. He also said that it is "a common occurrence" at City College for students to set fire to papers on a professor's office door, grade announcements and such, and agreed with the Court's observation that if a student gets failing grades, his response is sometimes not to study harder, but to torch the bad news. Tr. 311.

*The Shadow Sections*

After the appearance of his *Quadrant* book review, Professor Levin was summoned on October 21, 1988 to meet with then Philosophy Department Chairman Martin Tawny and Dean Sherwin. Professor Levin was requested by Chairman Tawny and Dean Sherwin to withdraw from teaching his required introductory Philosophy course, the next class session of which was to meet the following Monday. Among the reasons given by Dean Sherwin and Chairman Tawny for the request were that (1) there might be disruption of the class by demonstrators opposing Professor Levin's recently published views; and (2) some persons in the class might feel uncomfortable being taught by one holding such views. The previous day, the Faculty Senate had passed a resolution condemning his views in the *Quadrant* article, as expressing "racist prejudices [offensive to] our fundamental notions of human decency". PX 5.

Following the meeting, Professor Levin agreed to withdraw from this class. At the time of the meeting, neither Dean Sherwin nor Chairman Tawny had any specific knowledge of particular demonstrations or disturbances being planned.

There was no other occasion during the seven years of Sherwin's deanship when a professor was asked to withdraw from a class for the reasons for which professor Levin was asked to withdraw during the October 21, 1988 meeting.

On October 25, 1988, President Harleston issued a memorandum, PX 6, to the City College faculty in which he proclaimed himself to have been "a proud witness" to the Faculty Senate's discussion and condemnation of Professor Levin on October 20, 1988. President Harleston further suggested "that the Faculty Senate appoint a special faculty Committee to receive, investigate and make recommendations concerning any charges of bias related activities by faculty directed to or in interaction with students." The Faculty Senate ignored this proposal.

The following semester, Professor Levin resumed teaching his required introductory Philosophy course, and he was assigned to teach this course for the spring semester of 1990. Shortly after the appearance of his American Philosophical Association letter, Dean Sherwin, on February 1, 1990, (without prior notice) sent to Professor Levin's students a letter, PX 10, stating that Professor Levin had "expressed controversial views" and informing them of the availability of a newly opened second section—a "shadow" or "parallel" section—of Professor Levin's required introductory philosophy course to be taught by another instructor. Dean Sherwin also stated in that letter that he was "aware of no evidence suggesting that Professor Levin's views on controversial matters have compromised his performance as an able teacher of Philosophy who is fair in his treatment of students."

The College Philosophy Department Chair, Professor Charles Evans, resisted Dean Sherwin's suggestion that there be additional "shadow sections" for Professor Levin's students, but Dean Sherwin established such a class on his own authority. Professor Evans believed such an action to be immoral and illegal, and an unwarranted

interference in the discretionary powers of a department chairman.

No other "shadow" or "parallel" section has ever been created for any course at the College in order to provide students with the opportunity to avoid being taught by a particular instructor.

During the Spring 1990 semester, 36 students originally enrolled in Dr. Levin's required introductory Philosophy section; after Sherwin's February 1 letter, enrollment in this section was reduced to 27 and enrollment in the "shadow section," reached 11. During the Fall 1990 semester, 19 students enrolled in Dr. Levin's Philosophy section; 20 enrolled in the "shadow section" for this class. In prior years, enrollment in Dr. Levin's Philosophy class meeting at this time had been between 30 and 40.

Professor Levin wrote a letter to Dean Sherwin on February 7, 1990, PX 11, pointing out that many other faculty members had expressed controversial views on a variety of subjects without being "stigmatized" by the creation of a special shadow section so that students could escape exposure to those faculty members. Dean Sherwin replied in a February 17, 1990 letter, PX 12, in which he explained his position with the muddled invocation of the "Emersonian insistence that consistency is the hobgoblin of little minds." While Dean Sherwin stated again in that letter that he had "no reason to suppose [Professor Levin's teaching] is not being conducted in a highly professional way," he claimed to be "concerned about the psychic damage your beliefs may inflict on those ... who come to trust your authority."

Dean Paul Sherwin testified that he had indeed sent a letter dated February 1, 1990 to Professor Levin's students, in which he stated the following:

> You may know—and otherwise, I expect would soon learn from sources other than this letter—that Professor Levin has expressed controversial views on such issues as race, feminism and homosexuality. Last year the faculty Senate of the College registered its opposition to written statements by Professor Levin at the same time upholding his right as a faculty member to express his views without restraint. I should add that I am aware of no evidence suggesting that Professor Levin's views on controversial matters have compromised his performance as an able teacher of Philosophy who is fair in his treatment of students. Taking into consideration the rights and sensitivities of all concerned, and wishing to permit informed freedom of choice for students ... I have in this instance decided to open a second [section] ...

Tr. 187; PX 10. Dean Sherwin agreed that this action was unprecedented, *id.* and that it was condemned by the Faculty Senate. Tr. 197. He also conceded that prior to creating the shadow section to Professor Levin's required course, he tried to persuade the chairman of the Philosophy Department, Professor Evans, to assign someone other than Professor Levin to teach the course, but Evans refused. Tr. 209.

On February 15, 1990, Professor John Harbeson of the Political Science Department wrote a letter, PX 13, to Dean Sherwin on behalf of the Academic Freedom and Faculty Interest Committee expressing that body's "concern[] about the implications of [Dean Sherwin's February 1] letter for Professor Levin's academic freedom." *Id.*

On May 8, 1990, a letter, PX 36, signed by forty-three academics from a variety of institutions was sent to Dean Sherwin. The letter reads in part:

> We, the undersigned, write to convey to you and the entire City College administration our growing alarm at your increasing encroachments on the academic freedom of Professor Michael Levin. Your peremptory removal of him from his introductory classes in mid-semester 1988, and your letter of incitement—9 February 1990—sent to some of his students this semester, suggesting that they might wish to remove themselves, constitute improper and dangerous precedents. That letter itself admits that neither Professor Levin's speech, nor conduct in class, nor his grading patterns reflect in any way his scholarly or social views. If today Professor Levin may be deprived

of his academic freedom because some dislike his views, whose academic freedom will be safe tomorrow?

Though you may not have intended it, your actions give encouragement to the Nazi-like tactics of the student thugs who invaded Professor Levin's classroom, to the dismay and disgust of his own students. Such an outrage bears too close a resemblance to escape comparison with the beginnings of the downfall of the great German universities some sixty years ago.

Disagreement with any professor's views, Levin's included, is properly aired in public and scholarly debate. It does not license actions of the kind you or the invading students have taken. Academic allegiance ought properly to be only to the canons of reason and to rational debate.

Dean Sherwin replied to that letter with his own of May 16, 1990, and sent a copy of that reply, along with a cover note dated May 17, 1990, collectively PX 37, to each person who signed the May 8 letter to him. The text of that letter, which was silent on the matter of disruption of Professor Levin's classes, is here partially set forth:

> I am ... vexed by the claims that Levin's treatment at CCNY invites a comparison to developments in Germany sixty or so years back. Myself I am reminded of people back then whose abuses of rhetoric contributed in no small measure to sustaining their views on "racial" inferiority/superiority.
>
> I should add that I am generally in agreement with the assertion in your "Dear Colleague" letter that "Academic freedom, if it is to mean anything, must mean at least this: that a professor may hold views others dislike, even abhor, and be free of harassment from his institution while holding them." I too would support Professor Levin's right to hold his views. The decisive question is whether my unwillingness to require any of our students to take a course with him constitutes "harassment." My position in the academy requires me to be concerned about the entire educative process in our courses, and *my principal concern has been that,* upon learning of some of Professor Levin's views (and all of his students certainly would soon have learned of these views, represented in a less dispassionate way than in my letter), *some students might not be able to learn from him all that they should be learning* in Philosophy 101 ("Reason, Knowledge, Values"). (emphasis added).

On the issue of establishing the shadow sections to Professor Levin's classes, President Harleston testified that he approved the decision to do so because what is at issue is "whether students are to be held hostage to a particular point of view that by its nature impugns numbers of them, or whether students should have a choice." Tr. 153.

The following colloquy then ensued between Professor Harleston and the Court:

> THE COURT: [H]ow does the University set about determining whether the views of a particular teacher warrant the creation of this option for the students?
>
> THE WITNESS: Sir, I think it's inevitably ad hoc. That is the only way. There is no issue of a priori this, that or the other. Reference was made earlier to litmus test. There is no issue as to that. *But there is an issue of behavior, and an issue of statements. And they become then, I believe, the valid, appropriate basis for the institution to make a response.*
>
> THE COURT: For example, there is a problem in some University campuses about Creationism and Darwinian principles. If a number of students were offended by the ideas a professor had that were based on Darwinian principles, and felt that such views that man is descended from lower animal forms [were] broadly offensive to the dignity of large numbers of students, would that generalized finding of subjective concern on the part of students in your view require a university to create an option in its biology department to the views of a teacher espousing the principles of Charles Darwin?

THE WITNESS: I don't believe so. I don't want to be self serving, sir. The distinction that I see is that the Creationism versus Darwinism, that distinction does not denigrate a group of people defining the characteristics over which they have no control, i.e., sex, race, what have you. That becomes an issue in which the target is focused on the denigrating of particular individuals because they belong to a particular class, and I am speaking now in the area of race, ethnicity, the areas I indicated, sir, the ones that are at the forefront, I believe in that setting, if you are concerned about the appropriate climate of learning, you can't get it, from my point of view.

THE COURT: In your view it's the University administrator who makes this decision without regard to any subjective inquiry as to the feelings or views of the students in reaction to the particular professor's views?

THE WITNESS: Well, I wish that things were that simple, or maybe I don't wish they were that simple. When these things happen, they happen. *It is not the administration acting unilaterally. The climate, the range of responses.*

We had on the campus clear enough evidence in terms of the responses of faculty, students, and, indeed, even staff members with respect to what was happening in the climate of the college, was not some administrator sitting in some remote location making a judgment about the parallel course.

THE COURT: In other words, it's not a college administrator evaluating the views of, for example, the professor espousing Darwinism vis-a-vis the professor espousing Creationism and making some kind of theoretical assessment of whether or not these views would impact on a particular segment of students; but rather it's responding to complaints on the campus, in other words, a hub-bub is sufficient to invoke these considerations and perhaps lead to the creation of shadow sections? ... Is it merely a function of he or she who speaks and complains the loudest and perhaps uses the most

bullhorns, or is the most aggressive in terms of asserting a viewpoint, is that what is the ultimate factor in the decision of a university to create an alternate course?

THE WITNESS: It is certainly not the hub-bub or the squeakiest wheel. It's the accumulation, I believe it's the accumulation of a number of inputs and reactions that lead you in part to say, wait a minute, something is not happening here, I don't believe this is the proper environment for learning to take place.

And that while one person has to do it, a dean made the decision in the context of what was doing in managing his division, but it is not a knee-jerk response to a single event. *It is* as best I can say it, *the result of accumulation of responses and concerns that are really fed by faculty as well as students, sir.*

Tr. 153–59 (emphasis added).

Finally, President Harleston stated that he presently has no plans to commence tenure revocation proceedings or disciplinary proceedings against Professor Levin. Tr. 170–71.

*The Fitness Inquiry*

In the Spring of 1990, President Harleston made a second request to the College Faculty Senate that it appoint a faculty Committee to investigate allegations of bias or racism then being made at the College, implicating the writings of Professor Levin. This time, the Chair of the Faculty Senate responded to President Harleston that the Executive Committee of the Faculty Senate did not support the proposal and felt that such a Senate Committee would have a "chilling effect." PTO 17. Upon whom it did not say.

A Faculty Senate Committee does not, under § 7.2 of the City University of New York By–Laws, have the authority to present disciplinary charges against a member of the faculty; the President of a college does.

In the April 2, 1990 issue of *The Campus*, the college newspaper, President Harleston was reported in an article, PX 15, to have stated at a press conference on

March 28 that an ad hoc Committee would be formed to examine whether Professor Levin's views affect his teaching ability. "The process of removing a tenured professor is a complicated one," Professor Harleston said. "Tenure is the life-blood of the College. When it works well it is the lifeblood." President Harleston is also quoted in that article as expressing his opinion that "[Levin's] views are offensive to the basic values of human equality and decency and simply have no place here at City College. ..." *Id.*

President Harleston decided to appoint such a Committee himself. He solicited suggestions for its members from Dean McDonald and from College Provost Robert Pfeffer. Dean McDonald provided his suggestions in an April 20, 1990 memorandum to President Harleston, PX 25; Provost Pfeffer provided his in an April 24, 1990 memorandum to Harleston, PX 24. Not one of the persons on either of those two lists, or among the seven persons ultimately selected by President Harleston to serve on the Committee, has an academic background in philosophy.

Dean McDonald had a role in the drafting and circulation of a petition published in the April 16, 1990 issue of the Campus, PX 16, which condemned Professor Levin's published views as racist and sexist and questioned his suitability as a teacher and faculty advisor. Dean McDonald signed the petition, as did Dean Sherwin. Five of the fourteen names suggested by Dean McDonald in his April 20 memorandum to President Harleston for Committee membership were signatories to the petition; three of the seven President Harleston eventually chose for the Committee were signatories to the petition.

In a May 4, 1990 memorandum, which President Harleston wrote and had circulated to the College community, he announced formally the appointment of the Presidential Committee of seven faculty members, asked "to review the question of when speech both in and outside the classroom may go beyond the protection of academic freedom or become conduct unbecoming a member of the faculty, or some other form of misconduct." Ex. A to Complt. In performing this task, President Harleston "asked the Committee to specifically review information concerning Professor Michael Levin ... and to include in its report its recommendations concerning what the response of the College should be." The memorandum stated that the Committee had been asked to report to President Harleston periodically on its progress, but gave no deadline for the completion of its work.

When President Harleston wrote the memorandum, he was aware that the language he employed for the definition of the subject of the Committee's inquiry—conduct unbecoming a member of the faculty—is the language in the University By-Laws and Professional Staff contract then in effect, warranting the imposition of discipline on a faculty member, and that such discipline under those authorities may include the revocation of tenure. Within several weeks of the release of this memorandum, President Harleston had conversations with at least two faculty members, Professor Evans and Sociology Department Chair, Professor Steven Goldberg, concerning the fact that three of the Committee members had signed the petition condemning Levin. President Harleston did not consider speaking to those three Committee members or the Committee chair about whether this might impair either the appearance or the fact of their impartiality for the task.

A partial occupation of the College Administration building by students took place on May 8, 1990. President Harleston met with representatives of the students on May 9. In a May 14, 1990 memorandum, PX 66, he reported to the College Community on those talks. The memorandum states that the students expressed deep concern regarding the views of Professor Levin "and his continued presence on the faculty." President Harleston informed the students that on May 4 he had announced the formation of the Committee with its defined task, in apparent response to their demand for the firing of Professor Levin.

**912**

The Committee members decided to not meet with or invite any other persons (including Professor Levin) to speak before them, during the more than ten sessions conducted by them, except for Law School Dean Haywood Burns. Dean Burns addressed the Committee on one occasion on the topic of the First Amendment.

On June 28, 1990, counsel for Dr. Levin wrote President Harleston, Dean Sherwin and the Committee members a letter protesting the continuing violation of Professor Levin's rights and pointing out that the Committee's existence continued to compel him to decline invitations to speak and write.

On July 14, 1990, College Professor of Philosophy Stefan Baumrin wrote President Harleston a letter, PX 26, in which he stated that, "[t]he whole idea of either investigating or evaluating Levin's remarks, or indeed convening any kind of Committee to look into the writing or speaking of a tenured professor in our university, or any respectable academic institution is anathema ... Any special proceedings along these lines should be stopped forthwith."

During October of 1990, Professor Levin received two written death threats in his campus mail box.

Following and at least in part as a result of some or all of these incidents, the College Faculty Senate passed a resolution on November 15, 1990, PX 27, which read, in part:

> The Faculty Senate deplores as incompatible with the preservation of academic freedom any attempt by the administration or staff to change students course selections, or to influence students to change or reconsider their course selections, based on a faculty member's views;
>
> The Faculty Senate deplores as a violation of academic freedom any attempt by the administration or staff to pressure department chairs to determine instructional assignments on the basis of a faculty member's views; and

8. "DX ___" references defendant's exhibits.

> The Faculty Senate calls upon the administration to take all available measures to prevent disruption of classes and to discipline those who attempt such disruption.

The Report of President Harleston's Ad Hoc Committee on Academic Rights and Responsibilities, was issued on February 5, 1991 and received in evidence as DX V [8]. Its full text is as follows:

> The Ad Hoc Committee on Academic Rights and Responsibilities, in fulfillment of President Bernard Harleston's charge to "review when speech both in and outside the classroom go beyond the protection of academic freedom or become conduct unbecoming a member of the faculty", submits the following statement. This statement summarizes the Committee's deliberations on academic freedom in the context of faculty utterances and behavior that may denigrate a group by virtue of its race, class, ethnic origins, religion, gender or sexual orientation.
>
> *Academic Freedom*
>
> First, the Committee affirms its commitment to the principles of academic freedom and free speech. We consider faculty entitlement to freedom in research and discussion crucial to the intellectual vigor of the College. In this context, the Committee wishes to emphasize that protection of these principles is not just for the faculty, but also for the students, as it is a fundamental precondition for an exciting, challenging and open intellectual atmosphere.
>
> *The Learning Environment*
>
> The Committee also believes that the College has an obligation to uphold students' rights to a supportive learning environment. It finds that there are utterances by faculty, even outside of class, that can have a detrimental impact on the educational process. In particular, statements denigrating the intellectual capability of groups by virtue of race, ethnicity or gender have the clear potential to undermine the learning environment and to place students in academic jeopardy. It has been clearly established that a teacher's low expecta-

tions frequently have a negative effect on student performance. Furthermore, it is insufficient for an instructor who has publicly denigrated a group's intellectual capacity to argue that the general statement does not apply to the individuals in his or her class. It is, in fact, the student's perception of an instructor's low expectations that has the negative effect on academic performance.

The issue of in-class behavior is conceptually more clear-cut. It is clearly unprofessional and inappropriate for any faculty member to make it difficult for a student to fully participate in a class by virtue of the student's race, class, ethnic origins, religion, gender or sexual orientation. The fact that unfamiliar or controversial ideas have the potential to make some students uncomfortable is an inherent aspect of an open, vigorous learning environment. However, faculty have a responsibility to exercise appropriate restraint so as not to belittle a student, to prophesy the likelihood of his/her poor performance, or to, in any manner, undermine the equal educational opportunities of all students. Although there are existing mechanisms to deal with disciplining professors who harass students, they should be carefully reviewed in acknowledgment of the perception that the procedures for bringing redress are cumbersome and frequently ineffective.

### The Tension

There is clearly tension between the institution's need to protect academic freedom and free speech and its need to protect the learning environment when it is harmed by public utterances in the sense described above. There are other circumstances where such tension between rights occurs. An example is when an individual's speech causes direct harm to another individual; the laws of slander and libel deal with such circumstances. The issue of speech that causes harm to a group by virtue of its race, class, ethnic origins, religion, gender or sexual preference is certainly more complex and one on which there is no clear consensus. Many institutions, including

universities, are grappling with these general issues. We wish to emphasize, however, that in this report we are dealing with a narrower issue; that is, the issue of speech that can have a direct impact on the process of education.

The Committee feels that City College, with its rich history of intellectual discourse and its tradition of cultural pluralism, must establish a balance between the free speech rights of faculty and the rights of students to a learning environment free from harassment due to race, class, ethnic origins, religion, gender or sexual preference. We know of no panacea or "foolproof" approach to resolve the tension and achieve a perfect balance. The approach, therefore, should be one of "minimal harm" to each right.

On the one hand, we feel that there should be no disciplinary action taken against a faculty member for speech outside the classroom, even of the kind discussed above. Such disciplinary action would shift the balance too far and carries more risk than benefit.

On the other hand, the College has the responsibility to intervene when a professor jeopardizes the educational experience of students enrolled in a course. At the minimum, students under these circumstances should, after appropriate process, be able to resign from such a course without academic penalty, or be allowed to substitute another course to fulfill the requirement. If the course is required or essential to the student's program, and is not taught by any other professor, the situation is more problematic and other mechanisms, such as offering parallel sections may, accordingly, be needed.

We emphasize that there is no simple or totally satisfactory solution, but this should not deter the institution from addressing the problem.

### Professors Levin and Jeffries

The Committee was also charged to review information concerning Professors Michael Levin and Leonard Jeffries with the purpose of advising President Harle-

ston as to how their statements relate to our general position.

The statements by Professor Levin alleging the intellectual inferiority of blacks does, in our view, clearly have the potential to harm the process of education in his classes as discussed above. Thus we find that it is appropriate for the College to continue to carefully implement ways to protect the students from such harm. As we have stated previously, we also recommend that the President not institute disciplinary proceedings against Professor Levin.

There is another type of statement in the materials submitted to us. These include statements by Professor Levin advocating storekeepers rights to exclude black males, and statements attributed to Professor Jeffries to the effect that AIDS was created as part of a conspiracy by whites to destroy blacks or that make sweeping negative characterizations of whites. In our view, these are examples of statements that many would find outrageous and possibly offensive and that have a general negative effect on the campus atmosphere, but that do not impact directly on the process of education in class. Thus, although they may be deplorable, they should neither lead to disciplinary proceedings against Professors Levin or Jeffries nor other College administrative responses.

### Closing Remarks

In closing, we would like to emphasize that grappling with the problems of academic freedom, racism and cultural diversity must be an ongoing process. We have tried to contribute to that process, but also convey some of the complexity and conflicts inherent in these issues. In spite of the pitfalls, we are confident that we can succeed as a College to preserve our commitment to intellectual vigor and cultural diversity. In the long run, the limited administrative responses we have discussed will be less important to the health of the College than the continual general discussion and debate on these vital issues.

As is apparent, the Committee found that utterances by professors, even outside of class, can have a detrimental impact on the educational process, if they "denigrat[e] the intellectual capacity of groups by virtue of race, ethnicity or gender"; that a teacher's "low expectations frequently have a negative effect on student performance"; that it is "clearly unprofessional and inappropriate for any faculty member *to make it difficult* for a student to fully participate in a class by virtue of the student's race, class, ethnic origins, religion, gender or sexual orientation"; that "faculty have a responsibility to exercise appropriate restraint so as not to belittle a student, to prophesy the likelihood of his/her poor performance, or to, in any manner, undermine the equal educational opportunities of all students"; that existing mechanisms for "disciplining professors who *harass students* are ... frequently ineffective"; that in such circumstances the college "must intervene"; and that "the offering of parallel [shadow] sections" may, accordingly, be needed. (emphasis added).

It is fair to say, therefore, that the President's Committee has found that Professor Levin's writings constitute unprofessional and inappropriate conduct that harms the educational process at the College, and that the College has properly intervened to protect his students from his views by creating the shadow sections.

At the trial, Professor Levin testified that after he saw the May 4, 1990 memorandum of President Harleston announcing the foundation of the Committee to look into his fitness to teach, and in view of its membership and procedures, he viewed it as an attack upon his tenure, and concluded that President Harleston was really going to fire him. Tr. 15–23. We find this testimony especially convincing. As a consequence, during the period from May 4, 1990 through February, 1991 Professor Levin turned down "20 or more" invitations to speak or write about his controversial views on race differences and the impact on teaching. Tr. 52–53. An irony of the Professor's position as a target of the President's Committee is that during his 22 years of classroom teaching, Professor Levin has taught more than 3,000 students

and has never had a complaint that any has ever been treated unfairly on the basis of race. Tr. 59.

Professor Levin asserted that the Committee's Report did not make any effort whatsoever "to consider whether anything I said is true or false", and that "there is no effort whatever to document any of the factual claims that the report makes." Tr. 61.

Although Professor Levin testified that he was to some extent "reassured" by the Committee's recommending against disciplinary proceedings in his case, Tr. 62, he asserted, and we specifically find, that "the report certainly leaves the door open for future action" in that "new measures might be invoked" to deal, in the words of the report, "with disciplining professors who harass students." Tr. 63. The Professor stated that:

> [t]he report ends by saying that there should be "continual general discussion and debate on these vital issues." Since the report at no point discusses my views at all, even suggests that there is anything of substance to discuss, what they must mean by "continual general discussion and debate" must be what is to be done about someone who says these things not whether there is some merit or truth in these views per se.

Tr. 64.

At the trial, Professor Levin described the setting up of the shadow sections for both his required and elective courses, as "stigmatizing", Tr. 64, and asserted that since "as a practical matter it is not difficult for a student who wishes to either avoid a teacher or get a special teacher," the establishment of the shadow sections has "primarily a symbolic value ... it sustains the sense that I have been found in some way beyond the normal bounds of academic expression and opinion; that somehow or other I must be quarantined from the students." Tr. 64–65. We specially find that the shadow sections were established with the intent and consequence of stigmatizing Professor Levin solely because of his expression of ideas.

Professor Leonard Roellig, a member of the Physics Department of the College and Chairman of the President's Ad Hoc Committee, conceded that the Committee received no evidence to support the claim in its Report that Professor Levin's writings harmed or have the potential to harm the process of education in his classes. Tr. 84. He also conceded that nothing was received by the Committee that would tend to contradict Dean Sherwin's statement that he knew of no evidence that Professor Levin was anything besides an able teacher who was fair to the students in his class. Tr. 85. He further stated that the creation of the shadow or parallel sections was "specifically designed by the College to protect students from Professor Levin's views." Tr. 86. Finally, and most importantly, he agreed that the aforementioned finding that Professor Levin's views have potential to cause harm in the classroom is an adverse or negative finding by the Committee against Professor Levin, Tr. 88, and that that finding could have an adverse impact on his career. Tr. 102. In plain terms, the Chairman has conceded, and the defendants have not disputed, that the Committee's Report stigmatizes Professor Levin, as a real and present danger to the educational process of the College.

The following colloquy ensued between the Court and Professor Roellig:

THE COURT: Did [the Committee] give any thought to the question of whether or not the creation of shadow sections would create a peer pressure upon those who would not themselves be harmed, but might feel that the expectation of the University, of its officials and indeed the majority of students would be to abandon Dr. Levin and go to the shadow section? Was any thought given as to that?

THE WITNESS: The question of shadow sections was raised and considered by the Committee, its pros and cons. A person like myself would go to such a class given by Professor Levin, because we aren't in lock step and I'd like to hear his opposing views. That doesn't mean that somebody who is being denigrated by statements made by Professor Levin

about his race wouldn't go to a shadow section. They might want to hear what he had to say.

THE COURT: But you didn't gather any data—

THE WITNESS: No.

THE COURT: You didn't make any inquiries of the students in his class or the shadow section?

THE WITNESS: No.

THE COURT: Have you ever heard of the phrase "politically correct thinking"?

THE WITNESS: Absolutely.

THE COURT: Do you think that if the shadow section was viewed as a haven for those who were politically correct in their thinking, irrespective of whether they felt they would be harmed or whether objectively they could be harmed, do you think that the creation of shadow sections might in fact do damage on an overall basis to the educational process of the college?

THE WITNESS: I think that the creation of a shadow section for some students who would feel intimidated by the views that he has expressed, is a good thing.

THE COURT: That is not the question. The question is, what about the possibility of shadow sections encouraging people who did [not] feel intimidated and who were perfectly comfortable in Professor Levin's class but who in the nature of the climate felt, I better get over into that shadow section, because if I stay here, I will be seen [as] a racist?

THE WITNESS: I most certainly wouldn't interpret it that way.

THE COURT: I'm not saying you did. You said that the Committee was concerned about the overall impact on the educational process.

THE WITNESS: Yes, sir.

THE COURT: Of the expression of views of this type, correct?

THE WITNESS: Yes.

THE COURT: I asked you whether you considered shadow sections and you said yes, we did, and indeed you endorsed them because a few minutes ago you told me that was a perfectly appropriate method to protect people from Professor Levin's views, who might be harmed, correct?

THE WITNESS: Yes.

THE COURT: I said, putting aside those who might be harmed, what about the effect of such a device, shadow sections, on the student population in general? And I gave you an example of where it is certainly conceivable that students who would not in any way feel they might be harmed, they might nevertheless feel peer pressure to make haste to go into the politically correct shadow section as opposed to staying with the professor? Isn't that something the Committee gave thought to?

THE WITNESS: Yes, it did.

THE COURT: What did the Committee conclude?

THE WITNESS: We had faith in the students, in other words, that certain students might do that, but there would be many others that would not.

THE COURT: But that is just speculative.

THE WITNESS: Of course it is.

THE COURT: You didn't do any analysis of the record, and you certainly didn't question any of the students?

THE WITNESS: Didn't question any of the students or any of the faculty.

Tr. 90–93.

The Committee, according to Professor Roellig, its chairman, did not have the authority to recommend disciplinary proceedings against anyone. Tr. 108.

President Harleston testified that at the time he appointed his Ad Hoc Committee he was unaware of any evidence of misbehavior in the classroom by Professor Levin. Tr. 131. The full text of his formal May 15, 1990 charge to the Committee, and a subsequent modification as formulated by the Committee and dated September 17, 1990 are in the record as DX T and DX U respectively.

When he received the final Report of his Committee, President Harleston distributed it to the College Community with a cover

letter received in evidence as DX V. Excerpts from that letter are as follows:

> Earlier in my Presidency I released a statement to the College community in which I said: "there is no place at City College for racism, anti-Semitism, ethnic snobbism or any other attitude that denies equality among individuals ..."
>
> \* \* \* \* \* \*
>
> It has been our constant goal to ensure a campus environment characterized by civility, mutual understanding and respect among the diverse groups and individuals that make up the CCNY community. And I am proud that despite the widespread media attention that was paid to the inflammatory statements made by a few faculty, relations among students and faculty have been remarkably harmonious and free of conflict. Unfortunately, the same cannot be said with regard to many other institutions around the nation where the student bodies are far less diverse than ours.
>
> \* \* \* \* \* \*
>
> It was precisely for this reason—because we have been so successful in avoiding ugly racial incidents and confrontations—that I became deeply concerned about the inflammatory statements attributed to some faculty last year. I appointed the Ad Hoc Committee on Academic Rights and Responsibilities because I did not want the virus of racial and ethnic hatred to take root at City College. And I am confident that it will not because you—the faculty, students and staff—will not permit it!
>
> \* \* \* \* \* \*
>
> In my Commencement address last year I urged our graduates to bear in mind the distinction between disagreeing and being disagreeable; and to remember that verbal aggression all too often serves as a prelude to physical violence.
>
> \* \* \* \* \* \*
>
> I accept the report and the Ad Hoc Committee on Academic Rights and Responsibilities in that spirit. I wish to thank its members for completing their task with careful regard for the values of academic freedom, student rights and pluralism on our campus.

The Court heard the expert testimony of Professor Miro M. Todorovich on the future impact of the asserted injury to Professor Levin's professional stature and career prospects. We found this testimony imprecise and in large measure incoherent, and reject it in its entirety.

## FACTUAL SUMMARY

Based upon the foregoing established factual record, we conclude the following:

■ These College officials, including the defendants, knew that Professor Levin was the target, over the course of three years, of disruptive intrusions in and around his classroom, which were designed to and did injure his ability and right to conduct his classes. They knew, based upon the uncontroverted evidence provided by Professor Levin and College security personnel, that these actions were in clear violation of the College's regulations. They knew that these disruptions were intended to isolate and silence Professor Levin, and injure the learning environment of his students. They knew, at least in the cases of Pearl and Marshall, who the ring leaders were and chose, wholly without any documented justification, not to discipline them. They knew that implicit support for these tactics from the College Administration would further isolate Professor Levin, and gave that support by failing to denounce specifically the disruptions, by failing to affirm unequivocally Professor Levin's right to teach his classes unimpeded by the appalling behavior of the shouters, the intimidators and the bullies, and by issuing an official pronouncement of the College condemning only disruptive behavior "that interferes with or compromises *responsible* classroom teaching" (emphasis added). DX W.

■ These College officials, including the defendants, created the shadow sections in the absence of any complaint or proof that Professor Levin had behaved unprofessionally or unfairly toward his students. They did so in the absence of any

proof or showing that his writings were harmful, on either an objective or subjective basis, to students either in or outside Professor Levin's classes. They did so ostensibly to protect and shield students from his views, in spite of numerous assertions in the record by these officials that they had full confidence in the students to survive and indeed thrive in a broadly diverse academic community unhampered by the throttling of ideas, even noxious ideas. They did so with the intention of injuring Professor Levin's position as a tenured faculty member, by officially condemning his views as controversial and dangerous to the welfare of his students and the educational process in the College at large; by placing institutional pressure upon all students in his class to abandon him because his writings do not conform to the views of the College administrators; and by broadly circulating a letter with the ostensible purpose of giving students a choice of an alternative instructor, already available as a practical matter, but with the real and intended purpose of stigmatizing Professor Levin. The attendance in Professor Levin's classes was reduced as a specific and intended consequence of this stigmatizing letter, and Professor Levin was actually harmed in his standing and tenure as a member of the faculty and academic community.

■ These College officials, including the defendants, formed and supported the creation of the Ad Hoc Committee in order to give official expression to an institutional condemnation of Professor Levin's views. They did so by deliberately defining its mission in the context of a preliminary tenure inquiry; by encouraging a broad expectation and understanding in the College community that Professor Levin's fitness and conduct were being investigated when in fact there was no evidence that Professor Levin had engaged in *any* conduct, other than writing and publishing his thoughts; by obtaining Committee approval for the sanction of Professor Levin and his ideas through his partial quarantine, effected by the announcement and maintenance of the shadow sections; and by causing to be issued and approved the report of

the Ad Hoc Committee which is an impermissible institutional censure of Professor Levin, because it is admittedly predicated solely upon his protected First Amendment expression of ideas.

These official actions, and failures to act, by the defendants had, and were intended to have, and did have and continue to have, a chilling effect upon the exercise by Professor Levin of his constitutional rights of free speech. These official actions were taken in, and constitute retaliation for, Professor Levin's First Amendment expression of ideas. Professor Levin's apprehension of this chill was and is objectively reasonable under the circumstances because of the threat apparently and actually posed to his job, his professional standing, and his reputation, and the actual damage already done to his standing and tenure in the College.

## LEGAL ANALYSIS

A. The Complained of Actions were Carried Out Under Color of State Law.

■ To establish a claim under the Civil Rights Law, 42 U.S.C. § 1983, a plaintiff must establish two elements: first, that he was deprived of a right secured by the Constitution or the laws of the United States; and second, that the defendants who allegedly deprived him of that right were acting under color of state law at the time the alleged constitutional violations occurred. *Paul v. Davis*, 424 U.S. 693, 696, 96 S.Ct. 1155, 1158, 47 L.Ed.2d 405 (1976). To justify permanent injunctive relief from a constitutional violation, a plaintiff must first, establish the fact of the violation, and second, demonstrate the presence of continuing irreparable injury, as well as the lack of an adequate remedy at law. *Rosenberg v. Meese*, 622 F.Supp. 1451, 1476 (S.D.N.Y.1985).

■ Here, there is no question that the actions complained of were carried out under color of state law. President Harleston announced the appointment of the Presidential Ad Hoc Committee to the City College community by means of an official

memorandum from his office, bearing the seal of the College, PX 73, in which he described himself as naming a "City College Committee." President Harleston also circulated the report of the Committee, DX V, to the City College community by means of another official memorandum, DX Y, in which he formally accepted the report and thanked the Committee members for their service.

Similarly, Dean Sherwin wrote Professor Levin's students a letter, PX 10, signed in his official capacity, advising them of Professor Levin's "controversial views" and announcing the creation of the shadow sections. We further note that The City College Faculty Senate condemned this action as an "administrative effort to change students' course selection, or encourage them to change or reconsider their course selections, because of a faculty member's views." PX 27; Tr. 196–197. When Philosophy Department Chairman Evans vigorously opposed the creation of these sections, Dean Sherwin, by dint of his authority, overrode that opposition.

More to the point, these College officials undertook all actions germane to this lawsuit, or undertook to refrain from acting, in order to affect the teaching and academic environment of the College. They did so through the functional power of the positions of leadership conferred upon them by and through the State, which funds the College's operations.

As these actions clearly constitute state action, we turn to the issue of whether the actions deprived Professor Levin of constitutional rights and thus violated § 1983. The trial evidence convincingly establishes that they did.

B. Professor Levin's First Amendment Right to Free Expression Was Impermissibly Chilled, Impeded and Abridged.

In *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), the Supreme Court decided that a series of New York statutes and regulations designed to weed out "subversive" persons from state employment impermissi-

bly chilled the First Amendment rights of teachers because they failed to narrowly specify *actual conduct* that could legitimately be proscribed by the state. Significantly, at the time of the decision, two of the teacher appellants had not been dismissed under these rules; their continued employment was in doubt because of their stated refusal to sign what were, in effect, certificates about their political beliefs.

Justice Brennan focused on the deterrent effect achieved by the uncertainty as to what was proscribed:

> The very intricacy of the plan and the uncertainty as to the scope of its proscriptions make it a highly efficient *in terrorem* mechanism. It would be a bold teacher who would not stay as far away as possible from utterances or acts which might jeopardize his living by enmeshing him in this intricate machinery.... The result must be to stifle 'that free play of the spirit which all teachers ought especially to cultivate and practice ...' That probability is enhanced by the provisions requiring an annual review of every teacher to determine whether any utterance or act of his, inside the classroom or out, came within the sanctions of the laws.

385 U.S. at 601–602, 87 S.Ct. at 683 (footnote omitted, emphasis supplied). After stressing the importance to our society of freedom of inquiry for teachers, Justice Brennan reiterated the strictness of the standard applicable to regulation of freedom of speech:

> When one must guess what conduct or utterance may lose him his position, one necessarily will 'steer far wider of the unlawful zone ...' For '[t]he threat of sanctions may deter ... almost as potently as the actual application of sanctions.' The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed.

385 U.S. at 604, 87 S.Ct. at 684 (citations omitted). *See also Elrod v. Burns*, 427 U.S. 347, 359, 96 S.Ct. 2673, 2682, 49 L.Ed.2d 547 (1976) (conditions on public

benefits, including jobs, which chill First Amendment rights are prohibited).

■ Here, precisely that ambiguity was demonstrated at trial, aggravated in this case by several additional factors. First, the Committee's secret deliberations were predicated upon no announced or promulgated criteria or normative proscriptions. Second, Professor Levin had no way of knowing which of his statements were being reviewed by the Committee; that selection was made by President Harleston, with no notice to Professor Levin. Third, Professor Levin was given no opportunity to appear before the Committee or otherwise to defend those statements. Fourth, even though the Committee concededly made an adverse finding against him in his professional capacity as a tenured faculty member, there is apparently no forum or mechanism for him to challenge this finding. Fifth, though the Committee says it has completed its assigned task, its report invites and indeed recommends further and continuing scrutiny of Professor Levin, albeit in its characteristically elliptical and, we must say, Orwellian double-speak. Sixth, the Committee endorses the continued use of the shadow sections, without any indication of the danger such a procedure poses in real terms to a college teacher's standing in the College and the world at large.

■ The result is exactly that predicted in *Keyishian*, 385 U.S. at 601, 87 S.Ct. at 683. Professor Levin was forced to "stay as far away as possible from utterances or acts which might jeopardize his living" and therefore declined at least twenty invitations to speak or to write about his views during the nine-month period they were under scrutiny by the Committee. As we have found, Professor Levin had objectively reasonable bases to fear for his job during the nine months of deliberations of the Committee, despite having had tenure for sixteen years. The language of the Committee's charter (with its reference to "conduct unbecoming" a faculty member) was unmistakably, purposefully and admittedly drawn from the University By–Laws and faculty contract provisions governing discipline, including revocation of tenure. President Harleston confirmed that this was the source of that language and that his choice was deliberate. Professor Levin was aware that three of the seven members of the Committee had recently signed a petition condemning him and questioning his suitability as a teacher. President Harleston had recently been quoted in the college newspaper as saying, with reference to Professor Levin, that the process of removing a tenured professor is a complicated one and that "[t]enure is the life-blood of the College. When it works well, it is the life-blood ... [Levin's] views are offensive to the basic values of human equality and decency and simply have no place here at City College." President Harleston himself made no effort during the Committee's deliberations, despite a letter from the Professor's counsel seeking a modification of the Committee's charge, and despite the pendency of this lawsuit alleging a threat to his tenure, to assure Professor Levin that his job was and is not in danger. Professor Levin explained:

Q. Would you explain what the thinking process that you underwent was to come to that decision [to decline the invitations]?

A. Basically, it was this: I was being investigated, and it was quite plain to me, for statements I had made outside the class. No one had alleged I had said or done anything in class that was actionable, objectionable. The matters that were being investigated to see if they were conduct unbecoming a faculty member were some things I had written. Obviously, that was prompting all this. Anything I would have said further could only make matters worse. Possibly, what I had written so far they would find was all right. Maybe something I would write, something I would say publicly would go further. It was not a risk I was willing to take.

Tr. 53.

Nor is it a risk the Constitution permits the State to impose. In *Pickering v. Board of Education of Township High School Dist. 205*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), a case involv-

ing a teacher who wrote a letter to the editor of a local newspaper criticizing school board revenue policies, Justice Marshall made unmistakably clear that the First Amendment protects teachers against such a risk, holding that "absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." 391 U.S. at 574, 88 S.Ct. at 1738 (footnote omitted, emphasis supplied).[9] Yet Professor Levin's continued employability (under the "conduct unbecoming" standard) was plainly and exactly what the Committee was charged to evaluate, solely on the basis of his statements on issues of public importance. We note that the state has not shown that Professor Levin's statements were knowingly and recklessly made.

Under the rule thus enunciated in *Pickering*, the threat to Professor Levin's job posed by the Committee was simply illegitimate and not susceptible of justification by claims of other, proper motivation. However, even when we analyze defendants' explanations for their conduct under the authorities which provide guidance on screening constitutionally defective retaliatory actions from defenses based on legitimate state interests, the defenses presented here must fail.

■ The state must have a compelling state interest in the curtailment of speech when it is the content of that speech which the state aims to interdict. *Police Department v. Mosley*, 408 U.S. 92, 99–101, 92 S.Ct. 2286, 2292–93, 33 L.Ed.2d 212 (1972). In *Mt. Healthy City School Dist. Bd. of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Court established a three-step test to measure the pro-

priety of state action where it is claimed that other interests beyond suppression of the speech itself motivate actions taken against the speaker. Step one requires the plaintiff to show that his conduct was constitutionally protected; step two requires proof by him that such conduct was a "substantial" or "motivating" factor behind the adverse action. If the plaintiff makes this showing, the burden shifts to the state, in step three, to demonstrate by a preponderance of the evidence that the adverse action would have been taken against the plaintiff even in the absence of the protected conduct. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576.

■ Here, there is no question that the "conduct" of Professor Levin that provoked all of the actions challenged in this suit was protected expression. President Harleston charged the Committee to examine, and the Committee did examine, only his public writings and statements about his views on the relationship between race and test scores and his objections to affirmative action programs, quintessentially "issues of public importance." *Pickering, supra*, 391 U.S. at 572, 88 S.Ct. at 1736. Thus, the first *Mt. Healthy* requirement is met. At least as to the portion of the Committee's charge pertaining to him and as to the creation of the shadow sections, there is likewise no dispute on the second step, that Professor Levin's expression of his controversial views was not merely a "substantial" or "motivating" factor, it was the only factor.[10]

Under the *Mt. Healthy* analysis, the burden then shifted at trial to defendants to show that their complained-of actions would have been taken without the protected conduct. This they did not do and could not have done, because the only justifica-

---

**9.** In so holding, the Court explicitly declined to decide whether knowingly or recklessly false statements enjoy the same protection. *Pickering*, 391 U.S. at 573–74, nn. 5, 6, 88 S.Ct. at 1737–38 nn. 5, 6. We express no opinion as to the truth or falsity of Professor Levin's statements.

**10.** See Tr. 145 (President Harleston) ("I asked [the Committee] to look at the information about Professors Levin and Jeffries, because they were the manifest catalyst for the tension, the only sources of tension, the manifest sources for the tension especially at the time in April, 1990") and PX 10 (Dean Sherwin letter to Levin students) ("Professor Levin has expressed controversial views …").

tion for two [11] of the actions complained of (the Committee investigation of Professor Levin's public statements and the shadow sections) was premised upon the protected expression: the supposed necessity to protect Professor Levin's students from the claimed harm they might suffer if they thought, because of the expression of his views, that he might expect less of them or grade them unfairly.[12] As we have already observed, the defendants adduced no evidence to support this justification at trial.

Committee chairman Roellig admitted freely that the Committee had neither sought nor obtained any evidence whatsoever to support the three key findings of fact [13] it made about the purportedly harmful impact of Professor Levin's published views on his students. Instead he was reduced to claiming those findings of fact were "self-evident", Tr. 82, and referring vaguely to "perception," his experience with his own children, "various journals" and The New York Times Magazine Section. *Id.*

Specifically, Professor Roellig conceded that the Committee did not review the case of a single student, Tr. 90; did not examine the grades of any of Professor Levin's students, Tr. 89; did not gather any data or make inquiries of the students in the shadow sections, Tr. 91; did not do any analysis of the record or question any student or faculty member, Tr. 93; did not permit communication with persons who sought to address it on the subject of its inquiry, Tr. 93–94; did not solicit the assistance of any experts on pedagogy, Tr. 94. Furthermore, no members had ever taught or re-

ceived advanced academic training in Professor Levin's field, philosophy, Tr. 95. Far from receiving evidence of any improper treatment of Professor Levin's students, the Committee was aware of Dean Sherwin's statement that he "was aware of no evidence suggesting that Professor Levin's views on controversial matters have compromised his performance as an able teacher of Philosophy who is fair in his treatment of students," PX 10, and found nothing to contradict that evaluation. Tr. 85.

Dean Sherwin himself reaffirmed the accuracy of that assessment which was, paradoxically, contained in the letter he sent to Professor Levin's students advising them of the creation of the shadow sections. Tr. 187. In fact, Dean Sherwin conceded in response to a question from the Court that, prior to writing this letter, he had not received any expression of concern about Professor Levin's views from a single student. Tr. 204.

Dean Sherwin assertedly weighed his concern for the students, based upon a complete absence of complaint or other evidence of the purported danger of harm to them, against at least the following factors: (1) strong protest from Professor Levin against the singling out of his classes for this treatment based on his views and the resulting stigma (PTO ¶ 32, PX 11); (2) broad protests from dozens of other academics, on and off the City College campus, decrying the threat to Professor Levin's and his students' academic freedom (PTO ¶¶ 33–46); (3) the vigorous opposition of the Chairman of the Philosophy

---

**11.** Defendants did offer a different justification for the failure to prevent or act against disruptions of Professor Levin's classes, which rationale has been addressed above.

**12.** See, e.g., Tr. 151 (President Harleston) ("the fact of the students not being held hostage to points of view") and Tr. 211 (Dean Sherwin) ("students ... [might] prefer to study with a different instructor who did not necessarily have the views that Professor Levin had expressed about the intellectual inferiority or superiority of people belonging to various races or ethnic groups"). The Court asked committee chairman Roellig directly, "[w]ould it be fair to say that in substance the committee is asserting

here [in its report] that Prof. Levin's views harm the students and have harmed the students?" To that Professor Roellig simply replied, "yes." Tr. 86–87.

**13.** These are: (1) "statements denigrating the intellectual capability of groups by virtue of race, ethnicity or gender, have the clear potential to undermine the learning environment and to place students in academic jeopardy," DX V, (2) "a teacher's low expectations frequently have a negative effect on student performance," (id.), and (3) "the statements by Prof. Levin alleging the intellectual inferiority of blacks does in our view clearly have the potential to harm the process of education in his classes as discussed above" (id.).

Department, who viewed this unprecedented action as illegal, immoral and an unwarranted interference in his departmental authority (PTO ¶ 48); (4) the "ringing condemnation" (PTO ¶ 50) of his action by the City College Faculty Senate, which termed "administrative pressure on departmental chairs to consider a faculty member's views in determining course assignments" as "strik[ing] at the heart of academic freedom" (PX 27); (5) the financial crisis at City College militating against the survival of elective courses enrolling fewer than ten students (PTO ¶ 53), although the shadow sections were to survive even if as few as one or five students wanted them (PTO ¶ 52); and (6) the possibility that peer pressure would be exerted against students who wanted to stay in Professor Levin's class but would be considered associated with his somehow unacceptable views if they did (PTO ¶ 38–39, Tr. 188–90). Thereupon, Dean Sherwin decided the creation of the shadow sections was "more 'right' than 'wrong'" (PTO ¶ 55) and overrode all opposition. Tr. 222.[14]

Even if defendants had managed to offer any credible evidence to support their claimed fear that exposure in the campus environment to Professor Levin's views might somehow have caused some students harm, such evidence could have constitutionally been accorded no weight. That is the teaching of *Gay Alliance of Students v. Matthews*, 544 F.2d 162 (4th Cir.1976). In that case, Virginia Commonwealth University (VCU) refused to allow an association of gay students to register as a student organization in order to obtain benefits accorded to other groups, such as inclusion in a campus directory, the use of school facilities, and the opportunity to apply for school funding. The school based its refusal in part upon concern that " 'af-

filiation of individuals with homosexual activist organizations may have adverse consequences to some individuals involved.' " *Id.*, at 165 (quoting VCU brief).

The Fourth Circuit held inadequate VCU's justifications (for even the relatively mild sanction of refusal to permit registration of the student group) under the strict standard set forth in *Police Department of the City of Chicago, supra,* for actions aimed at suppressing the content of speech, and stated unequivocally:

> [A] state college or university 'may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent.' ... Similarly, VCU may not hinder the exercise of first amendment rights *simply because it feels that exposure to a given group's ideas may be somehow harmful to certain students.*

544 F.2d at 166, (citation omitted, emphasis supplied).

Other courts applying *Mt. Healthy* in the education context have been equally as stringent, even where the improper sanction falls short of dismissal. *See, e.g., Columbus Education Ass'n v. Columbus City School Dist.*, 623 F.2d 1155, 1159–60 (6th Cir.1980) (§ 1983 injunction required to expunge letter of reprimand placed in personnel file of zealous union spokesman which would otherwise have chilling effect on exercise of free speech); *Allaire v. Rogers*, 658 F.2d 1055, 1058 n. 2 (5th Cir.1981), *cert. denied sub nom. Rogers v. White*, 456 U.S. 928, 102 S.Ct. 1975, 72 L.Ed.2d 443 (1982) (citing cases, alteration of employment conditions short of termination in retaliation for protected conduct not permitted); *Knapp v. Whitaker*, 757 F.2d 827, 843–46 (7th Cir.), *cert. denied*, 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985) (relief awarded under § 1983 included in-

14. Moreover, the evidence showed that the creation of the shadow sections was not necessary to provide the alternative for students which was Dean Sherwin's purported justification for that action. Following Dean Sherwin's February 1, 1990 letter, eleven students moved into the shadow section for Professor Levin's Spring 1990 Philosophy 101 F class. PTO ¶ 56. Yet Dean Sherwin testified that there were as many

as nine sections of Philosophy 101 available at City College during the semesters when Professor Levin taught that class; that transfers between sections happen "fairly frequently"; and that if a student had requested a transfer out of Professor Levin's section into another, even relatively late in the semester, Dean Sherwin would have made that possible. Tr. 218–20.

junction expunging retaliatory negative evaluations from teacher's personnel file).

It is, therefore, clear that Professor Levin has prevailed on his First Amendment claim.

### C. Professor Levin Was Improperly Deprived of Fourteenth Amendment Liberty and Property Interests.

The Supreme Court has considered Fourteenth Amendment liberty and property interests, and the protection afforded them by procedural due process in the educational environment in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

In *Roth*, the Court reviewed the claims of a non-tenured teacher at a state college who was not rehired at the conclusion of his employment contract term, allegedly because of criticism of school officials. The Court, acknowledging the difficulty of framing any precise definition of liberty interests protected by the Fourteenth Amendment, expressed no doubt that, "[i]n a Constitution for a free people ... the meaning of 'liberty' must be broad indeed." 408 U.S. at 572, 92 S.Ct. at 2707. Nonetheless, the Court held that the teacher's liberty interests were not impaired by his nonrenewal because, in declining to rehire him, the school made no charge which would damage his standing in the community or otherwise put his good name and reputation at stake. If, however, the school had imposed on him such a stigma, foreclosing other potential employment opportunities, due process would have required an opportunity to refute the charges before university officials. *Id.* at 573–74, 92 S.Ct. at 2707. The Court also held that no property interest was impaired because the teacher had no claim of entitlement to be rehired. *Id.* at 577, 92 S.Ct. at 2709.

■ Here, by contrast, Professor Levin has been stigmatized professionally by the College, has been warned by the Committee that his speech (as it may relate to unbecoming conduct) should be the subject of continuing scrutiny by the College, and his use of his tenure has been undermined by the policy of the College of inducing his students to abandon him because of his views.

These actions by the defendants, as we have found, have damaged his standing in the academic community, and may foreclose future employment and scholarly opportunities.[15]

It is undisputed that Professor Levin was given no due process opportunity, to know, answer and refute the charges made against him by President Harleston, Dean Sherwin and the Committee. It further bears emphasis that the Committee did *not* flatly assert that the expression of his views alone, outside of his classroom, did not and does not subject him to a future charge of conduct unbecoming a faculty member, a dischargeable offense, his tenure notwithstanding.

■ In *Perry v. Sindermann, supra,* the Court expanded upon the teaching of *Roth*, warning that the " 'property' interests subject to procedural due process protection are not limited by a few rigid, technical forms", and do not necessarily even require, or implicate, a contractual tenure provision. Rather, "property" denotes a broad range of interests that are secured by "existing rules or understandings officially promulgated and fostered" by a University 408 U.S. at 601, 92 S.Ct. at 2699 (citation omitted). It found in that case a property right equivalent to tenure even where no formal tenure system existed. Here, of course, Professor Levin's tenure, for the moment intact, not only remains threatened by the implied assertion of the Committee and the College that his expression of ideas constitutes unbecoming conduct that make him unfit to have tenure, but his tenure has in fact been undermined by the College's finding, without any foun-

---

**15.** Even the Committee members found Dean Sherwin's letter to Professor Levin's students improper (PX 72; Tr. 96–98) and Chairman Roellig agreed that adverse findings in the Committee's report could detrimentally affect Professor Levin's career, harm his status in the academic community and harm his reputation generally. Tr. 102.

dation whatsoever, that his students have in fact been injured by his views. We find, based upon the record, that a longstanding, indeed, historic "understanding," officially promulgated and fostered by the College, has been guaranteed and made an inherent part of tenure at City College, that all teachers, tenured and non-tenured alike, shall be free of thought control outside of the classroom (and indeed, inside the classroom as well) by University or College officials and administrators.

In *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), a case involving the circulation of "mug shots" of suspected shoplifters by police officials, the Supreme Court revisited the area of defamation by the State, indicating that some factor beyond such defamation is required for there to be a constitutional deprivation of a property interest in such state action. As the Court of Appeals indicated in *Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989), it is not clear what the additional factor must be. However, Judge Newman suggested, in *Neu*, that defamation occurring during the course of "termination or alteration of some other legal right to status" will suffice. *Id.*[16]

 This case illuminates the fact, recognized by the Supreme Court, that tenure is more than the right to receive a paycheck. Academic tenure, if it is to have any meaning at all, must encompass the right to pursue scholarship wherever it may lead, the freedom to inquire, to study and to evaluate without the deadening limits of orthodoxy or the corrosive atmosphere of suspicion and distrust warned against in *Sweezy v. State of New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957).[17]

 Here, Professor Levin has been stigmatized in a setting where, as the City College Faculty Senate has recognized, his academic freedom has been infringed by administrative interference with his expression of ideas and his class assignments. PX 27. He has been deprived of the freedom to which he is entitled to write and to speak in the areas of his scholarly interest. He is currently deterred from seeking outside grants to fund research on his "controversial" topics of interest because his grant applications must be reviewed by the defendants in this action. Tr. 67–68. He is currently inhibited from discussing "controversial" topics with his own students, even if they raise them and even if the topics are pedagogically appropriate, because of the threat to his career. Tr. 373–374.

It is, therefore, clear that Professor Levin has prevailed on his Fourteenth Amendment claim.

D. Permanent Injunctive Relief is Necessary to Protect Professor Levin's Constitutional Rights.

 An injunction is a favored remedy where constitutional rights are threatened. As Judge Motley held in *Ostrowski v. Local 1–2, Utility Workers Union of America, AFL–CIO*, 530 F.Supp. 208 (S.D.N.Y.1980): "As a general principle, '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' *Elrod v. Burns*, 427 U.S. 347, 373 [96 S.Ct. 2673, 2690, 49 L.Ed.2d 547] (1976). Thus a showing of a 'chilling effect' on plaintiff's exercise of First Amendment rights is adequate to support injunctive relief." *Id.* at 215.

 Here, the chilling effect on Professor Levin's rights has not ceased, since the shadow sections remain in effect, since the disruption of his classes has not been denounced by the College, since its regulations implicitly approved disruption of irresponsible classroom teaching, and since he

---

16. See cases discussed in *Neu v. Corcoran*, 869 F.2d at 669 n. 2, including *Little v. City of North Miami*, 805 F.2d 962 (11th Cir.) (1986) (law professor's allegation that City Council's defamation damaged business reputation satisfied "stigma plus" requirement of *Paul*).

17. "No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any principles are accepted as absolutes." *Id.*

remains under further possible scrutiny by the Committee or other procedural arm of the President. But even if we were to accept the argument of defendants that the threat to Professor Levin's rights has temporarily abated, a permanent injunction is here authorized and warranted. The leading case on the propriety of awarding injunctive relief where there is a claim that the allegedly improper activity has ceased is *United States v. W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). In that case the government sued under the antitrust laws to enjoin interlocking directorates among potential competitors. The individual serving on multiple boards resigned and defendant sought to avoid the injunction on the ground it was no longer needed, even disclaiming any intention to revive the interlocks. The Court held that that was insufficient to avoid the injunction. Where there is cessation of allegedly illegal conduct but the defendant is free to return to the challenged activity, even without any professed present intention to do so, and where there is a public interest in having the legality of the practices at issue settled, the defendant must carry the "heavy burden" of demonstrating that there is no reasonable expectation that the wrong will be repeated. 345 U.S. at 632–33, 73 S.Ct. at 897–98.

More recently, the Court of Appeals applied *W.T. Grant*, again in the antitrust context, in *R.C. Bigelow v. Unilever N.V.*, 867 F.2d 102, 105–06 (2d Cir.), *cert. denied sub nom. Lipton v. R.C. Bigelow, Inc.*, —— U.S. ——, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). In that case a competitor sued for a Clayton Act injunction to prevent the merger of two of the biggest companies in its industry. During the litigation the proposed merger was cancelled. The Court held that, where the cessation of the anti-competitive activity was uncertain, the claim of mootness would not be sustained.

The same reluctance to permit escape from judicial review is manifest where re-

lief is sought, as here, under 42 U.S.C. § 1983. In *Eng v. Smith*, 849 F.2d 80, 83 (2d Cir.1988), the Court of Appeals reviewed on interlocutory appeal the grant of a preliminary injunction in a § 1983 class action seeking the provision of certain mental health services at Attica prison. The Court of Appeals considered and rejected defendants' claim that they had voluntarily implemented substantially all the measures required in the preliminary injunction, because there was nothing to prevent the abandonment of those measures absent the court order.[18]

In *Steele v. Van Buren Public School Dist.*, 845 F.2d 1492, 1494–95 (8th Cir.1988), the court rejected a mootness challenge to a § 1983 injunction banning prayer in a public school in violation of the establishment clause of the First Amendment. The school district and the teacher who had begun the practice attacked the injunction awarded by the district court as moot because the practice had been "permanently discontinued" voluntarily prior to the issuance of the injunction. The court applied the rule in *W.T. Grant, supra,* and held that, because the same or another teacher could resume religious activities, the district had not carried its "heavy burden" of showing that there was "no reasonable expectation" that the challenged activity would resume.

Here, the evidence at trial showed that there is every reason to believe defendants' improper activities will continue. President Harleston's assertion that he has no present plans to commence tenure revocation or other disciplinary action against Professor Levin, Tr. 170–71, like the similar disavowals in *W.T. Grant, R.C. Bigelow, Inc.* and *Steele, supra,* are made in the context of litigation and must necessarily be suspect.

Furthermore, President Harleston testified that new public statements by Professor Levin may not be encompassed by the

---

**18.** See also *Fisher v. Koehler,* 692 F.Supp. 1519, 1565 (S.D.N.Y.1988) (need for injunctive relief not mooted by measures prompted in part by litigation); *Monroe v. Bombard,* 422 F.Supp. 211, 215 n. 5 (S.D.N.Y.1976) (voluntary change of prison board regulations does not moot § 1983 injunction action where defendants did not admit challenged activity was illegal nor demonstrate conclusively that wrong will not be repeated).

Committee's report and recommendations, Tr. 142; and that Professor Levin's writings that he supplied to the Committee possibly constitute "conduct unbecoming a faculty member," Tr. 143.

There is no doubt as to the continuation of the shadow sections for Professor Levin's classes, as Dean Sherwin has stated that they will continue, Tr. 222, PTO ¶ 55, and President Harleston testified to his approval of the practice. Tr. 153.[19]

### E. The Defense of Qualified Immunity Is not Available.

The defendants stated in the Pretrial Order, ¶ 1, that they intended to assert the defense of qualified immunity. However, the defense was neither presented nor even mentioned in the Defendants' opening, Tr. 11–14; closing, Tr. 377–392; or at any place in the trial record. The defendants did not argue, or indeed, even mention, the defense in their Pretrial Memorandum of Law, dated February 11, 1991; their Post-Trial Memorandum of Law, dated May 28, 1991; or their Proposed Findings of Fact and Conclusion of Law, dated February 11, 1991.

■ We, therefore, need only reiterate what our Court of Appeals has already asserted. Where University administrators retaliate against a teacher based solely upon the content of his protected writings or speech as a teacher, such conduct is, as a matter of law, objectively unreasonable. *Dube v. State University of New York*, 900 F.2d 587, 598 (2d Cir.1990). We have found such retaliation here, and accordingly, the

qualified immunity defense is not available to these defendants.

## CONCLUSION

Accordingly, for the foregoing reasons, this Court declares that Professor Michael Levin's First and Fourteenth Amendment rights have been violated by the defendants, and they are hereby (1) permanently enjoined from commencing or threatening to commence any disciplinary proceedings against, or other investigation of Professor Michael Levin predicated solely upon his protected expression of ideas; (2) permanently enjoined from creating or maintaining "shadow" or "parallel" sections of his classes predicated solely upon Professor Levin's protected expression of ideas; and (3) permanently enjoined to take reasonable steps to prevent disruption of Professor Michael Levin's classes.

The Clerk of the Court is directed to enter judgment for the plaintiff.

The Court will, upon submission of a bill of costs and fees, consider whether to award attorney's fees and costs, pursuant to 42 U.S.C. § 1988. Any such submission will be made within ten (10) days of the date of this Order.

SO ORDERED.

---

**19.** We are not unmindful of the Supreme Court's observation that "Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decision-making by the academy itself". *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 226 n. 12, 106 S.Ct. 507, 514 n. 12, 88 L.Ed.2d 523 (1985), citations omitted. Cf. *Piarowski v. Illinois Community College Dist. 515*, 759 F.2d 625, 629 (7th Cir.) (Posner, J.) (discussing how "these two freedoms are in conflict"), *cert. denied*, 474 U.S. 1007, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985). We are constrained to observe, however, that nowhere in the record have the defendants presented evidence, or indeed even seriously argued, aside from a random stray piety here and there, that this is a case for a finding of compelling constitutional autonomy for the College irrespective of any individual rights of an individual professor that may have been abridged. Moreover, the institutional autonomy question is not conventionally implicated here, even in theory, because the defendants, being officials acting under color of state law are subject to liability here under federal civil rights laws. In any case, University and College administrators may under certain circumstances penalize a faculty member for deficient scholarship or teaching, *if* they follow proper procedures, apply clear and announced criteria, and invoke, without distortion, peer judgment. This was manifestly not done here.